UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

BURLINGTON SCHOOL DISTRICT,   )
                              )
          Plaintiff,          )
                              )
     v.                       )   Case No. 2:22-cv-215
                              )
MONSANTO CO., SOLUTIA, INC.,  )
and PHARMACIA LLC,            )
                              )
          Defendants.         )

## AMENDED OPINION AND ORDER

The Burlington School District ("BSD" or "Plaintiff") commenced this action after discovering polychlorinated biphenyls ("PCBs") at Burlington High School ("BHS"). Defendants Monsanto Co., Solutia, Inc., and Pharmacia LLC ("Defendants") are allegedly successors to the old Monsanto company ("Monsanto"), which was the primary manufacturer of PCBs in the United States for several decades. The Complaint asserts claims for damages resulting from PCB contamination at BHS.

Pending before the Court is Defendants' motion for summary judgment. For reasons set forth below, the motion is denied.

## Background

### I.  Monsanto's History with PCBs

Swann Research, Inc. began producing PCBs in the United States in 1929. Monsanto purchased Swann in the early 1930s. For all practical purposes, Monsanto was the sole producer of PCBs

in the United States. The company stopped manufacturing PCBs in 1977.

PCBs are man-made compounds consisting of two benzene rings (a biphenyl) and between one and ten chlorine atoms attached to the rings. There are 209 possible arrangements of these molecules, known as PCB congeners. PCBs had applications in numerous end products, including paints, adhesives, caulk, mastic, and plastics. Caulk and mastic containing PCBs were commonly used in buildings built between the 1950s and the 1970s, including schools.

PCB-containing products that are not sealed in airtight containers, such as caulks and paints, are known as "open uses." Due to their vapor pressure, PCBs can volatilize into the air from such open uses. Once PCBs volatilize, they can remain in the air or adsorb onto (adhere to the surface of) other materials, including dust. Inhalation of volatilized PCBs is a potential exposure pathway for humans. Depending on the extent of exposure, PCBs can accumulate in the human body and bloodstream.

Monsanto produced and marketed PCBs under the tradename "Aroclor." Aroclors come in a range of consistencies, from liquids and oils to solids such as resins, waxes or powders. Higher chlorinated Aroclors volatilize more slowly than lower chlorinated Aroclors.

2

Monsanto began promoting PCBs as a plasticizer in the 1930s. Plasticizers are additives that increase the plasticity or fluidity of a material. PCBs were sold to commercial manufacturers, who used them to develop materials for a range of uses across various industries. Those uses included household products such as fabrics and envelopes. Defendants submit that the product manufacturers, and not Monsanto, determined which products would incorporate PCBs.

Plaintiff contends that Monsanto has known for several decades that PCBs are harmful to human health. In 1937, the Dean of Harvard School of Public Health, Dr. Cecil Drinker, concluded that PCBs may have systemic effects on liver health. Dr. Drinker also found that PCBs may have contributed to the death of workers exposed to PCB vapors.

A 1937 memorandum reflects Monsanto's awareness of animal studies showing that, under certain conditions, Aroclor vapors caused systemic toxic effects. In November 1940, Monsanto's Research Directors reviewed a suggestion from the company's Phosphate Division recommending establishment of facilities to study toxicology and nutrition. The Research Directors decided not to approve the suggestion, finding that setting up a "colony of test animals" would require "[a] huge investment," that outside data would carry greater prestige, and that it would be

3

difficult to find a single person to "handle the various phases of the problem." ECF No. 171-25 at 12.

In 1950, employees at a facility in Indiana became ill. Dr. R. Emmet Kelly, Monsanto's medical director, acknowledged in a letter to the Indiana State Board of Health that "the Aroclor fumes might have caused liver damage." ECF No. 171-22 at 2. Dr. Kelly also stated that Monsanto "advised protection against all Aroclor fumes when an elevated temperature is used." *Id.*

In 1953, Monsanto conducted a study of Aroclor vapors in a recently-painted room. The study found that in a heated room, the concentration of vapors might remain high for a long period of time. Defendants note that the room was small with limited ventilation, and that some of the samples were taken when the temperature was approximately 90 degrees Fahrenheit. Plaintiff contends that the paint study should have prompted Monsanto to conduct testing for other open use products such as caulk and mastic.

In 1955, Dr. Kelly acknowledged that Aroclors are toxic. He also recommended against further testing, explaining his rationale as follows:

> We know Aroclors are toxic but the actual limit has not been precisely defined. It does not make too much difference, it seems to me, because our main worry is what will happen if an individual develops [sic] any type of liver disease and gives a history of Aroclor exposure. I am sure the juries would not pay a great

4

> deal of attention to [maximum allowable concentrations].
>
> We, therefore, review every new Aroclor use from this point of view. If it is an industrial application where we can get air concentrations and have some reasonable expectation that the air concentrations will stay the same, we are much more liberal in the use of Aroclor. If, however, it is distributed to householders where it can be used in almost any shape and form and we are never able to know how much of the concentration they are exposed to, we are much more strict. No amount of toxicity testing will obviate this last dilemma and therefore I do not believe any more testing would be justified.

ECF No. 171-23 at 3.

A 1956 report from Monsanto's Organic Chemicals Division stated that "[i]nhalation of [Aroclor] vapors is usually followed by systemic poisoning. The liver is affected by serious exposure to vapors. Toxicity increases with increasing degree of chlorination. The proper protective clothing should be worn when handling Aroclors. Respiratory equipment should be used when vapor contact is anticipated." ECF No. 171-49 at 11. Plaintiff contends that Monsanto failed to provide similar warnings to the public. Defendants dispute that assertion, citing a 1960 technical bulletin warning that "[v]apor of the liquid AROCLOR compounds at room temperature should not be breathed in a confined space, and no vapor of any AROCLOR compound evolved at elevated temperature should be allowed to be dispersed into the general workroom." ECF No. 190-5 at 56.

In 1957, the United States Navy found that PCBs resulted in liver damage in a population of test rabbits, and that skin application of PCBs killed the rabbits that were tested. Because of these results, the Navy notified Monsanto that it was discontinuing the use of a Monsanto product known as Pydraul 150 in its submarine periscopes.

By 1960, Monsanto had created a group of its own specialists known as the "Plasticizer Council," and made the group available to customers to consult on the selection and optimization of plasticizing systems. Monsanto's specialists sometimes worked in customers' plants, conducting trials and making modifications to assist with mass production. Some customers looked upon the Plasticizer Council as an extension of their own technical facilities. Defendants note that while Monsanto provided guidance on formulation, it made no final decisions about product design or use.

Monsanto ran tests on caulk in the 1960s. The study ranked several plasticizers in order of volatilization and found that, under the high-temperature testing conditions, Aroclor 1254 was more volatile than any of the non-PCB compounds tested. Plaintiff notes that, despite this evidence of volatility, Monsanto never evaluated the toxicity of the airborne emissions.

Plaintiff also highlights statements within Monsanto's documents concerning the company's response to health and safety

concerns. In 1958, an internal memo discussed a customer's request for a "caution stamp to be affixed to all Pydraul which they purchase from Monsanto for resale." ECF No. 171-44 at 2. While the existing caution stamp warned users to avoid prolonged breathing of vapors and dust, and to avoid contact with skin, the new warning would add specific protocols if the product came into contact with skin, eyes, or clothing. *Id.* The Monsanto memo stated the company's concern that the new warning was "not in the best interest of Pydraul sales. . . . It is our desire to comply with the necessary regulations, but to comply with the minimum and not to give any unnecessary information which could very well damage our sales position in the synthetic hydraulic fluid field." *Id.*

In 1962, Dr. Kelly informed the United States Public Health Service that "our experience and the experience of our customers over a period of nearly 25 years has been singularly free of difficulties." ECF No. 171-48 at 2. A 1965 letter from Dr. Kelly to a supervisor at the DuPont company stated that "the question of possible carcinogenesis . . . can be dismissed completely." ECF No. 171-45 at 2. In 1968, Dr. Kelly informed Kaiser Aluminum that, with respect to Pydraul 312, "we have had no cases of illness occurring in our employees . . . , nor have we had reports of injuries from the field." ECF No. 171-47 at 2.

7

Between 1951 and 1971, Monsanto sold approximately 145 million pounds of the Aroclor 1200 series as plasticizers, solvents, and modifiers for use in products including coatings, adhesives, and sealants such as caulk. These products were used in both indoor and outdoor applications, depending on the product. For much of the twentieth century, Monsanto was one of the largest chemical, plastics, and petroleum companies in the United States.

Monsanto commissioned its first two-year carcinogenicity study in 1968. In 1970, when Monsanto replaced Aroclor 1254 and Aroclor 1260 with less chlorinated PCBs in its Pydraul line of products, the company issued a letter to employees entitled "Pollution Letter." ECF No. 171-15 at 2. The letter explained that the change had cost the company "research monies and time," and that "[w]e have done it to keep our customers out of possible trouble." *Id.* at 3. The letter further explained that, when discussing the change with customers, employees should "[b]e positive. Take the offense. Don't let a customer or competitor intimidate you. I doubt if our competitors know whether their product could present a problem to our environment." *Id.* The letter also stated that "[w]e can't afford to lose one dollar of business," *id.*, which Defendants contend related to the importance of customer retention. ECF No. 190-1 at 16.

8

In 1969, Monsanto formed an *ad hoc* committee to address allegations of environmental harm related to PCBs. According to a draft report, the committee's objective was to "(1) Protect continued sales and profits of Aroclors; (2) Permit continued development of new uses and sales[;] and (3) Protect the image of [the company] as members of the business community recognizing their responsibilities to prevent and/or control contamination of the global ecosystem." ECF No. 171-54 at 4. The committee recommended "a number of actions which must be undertaken in order to prolong the manufacture, sale and use" of Aroclors. *Id.* at 5. The committee also recommended warning all Aroclor 1254 and 1260 customers of environmental problems; consulting with federal agencies; and expanding the company's own analytical capabilities. *Id.* at 6. Notes from a "PCB Committee" meeting that same year reflect discussions of possible options: "1) Go out of Business," "2) sell the Hell out of [Aroclors] as long as we can and do nothing else," or "3) try to stay in business in controlled applications – control contamination levels." ECF No. 171-55 at 6. Defendants submit that those notes do not reflect Monsanto's ultimate course of action.

Monsanto stopped selling PCBs as plasticizers in 1971, and discontinued manufacture of PCBs altogether in 1977. In 1976, Congress passed the Toxic Substances Control Act, which made it

illegal to manufacture PCBs without clearance from the EPA. 15 U.S.C. § 2605(e)(2)(A) & (B). In 1979, the EPA issued a public notice regarding its findings on PCB toxicity. The EPA also issued regulations prohibiting the manufacture of PCBs and the use of PCBs in "non-enclosed" applications. In 1994, the EPA stated that PCBs could not be used in sealant or coating.

## II.   Burlington High School and PCBs

Burlington High School was built in the 1960s. As originally constructed, BHS consisted of six buildings, lettered A through F. Buildings A-E were constructed around 1963, and Building F was constructed around 1967. Building F was also known as the Burlington Technical Center ("BTC"). Like many schools built at that time, BHS was constructed using, among other things, caulk, mastic, and adhesive that contained PCBs.

In or around 2018, BSD sought to update the buildings and considered various options, including: (1) demolishing and building new for $100 million; (2) partially demolishing and renovating/expanding for approximately $70 million; or (3) addressing deferred maintenance for approximately $30 million. In April 2018, the School Board voted for the renovation and expansion option, and in November 2018, Burlington residents voted to authorize a $70 million bond to finance the project.

As of August 2019, the cost estimate for the renovation had grown to $91 million, and BSD undertook a process of cost

10

cutting. Major renovations to Building F were removed from the project, as well as repairs to the student parking lot and replacement of the gym floor. In April 2020, the School Board approved an additional $3.6 million. In early 2021, BSD's contractors submitted a new cost estimate of over $77 million. BSD's Building Construction Oversight Committee continued to explore ways to reduce the cost.

In July 2019, environmental consultant ATC reported the discovery of PCBs in the soil in the Building F elevator pit. Over the course of the following year, ATC performed additional sampling of building materials. In April 2020, caulk in Buildings A-F was found with PCB concentrations in excess of 50 parts per million ("ppm"). Preliminary core samples from interior plaster indicated PCBs had leached into surrounding brick and plaster at concentrations greater than 1 ppm. According to a report authored by Plaintiff's expert Kevin Coghlan, an industrial hygienist, the EPA regulates "PCB bulk product waste" if it contains PCBs greater than 50 ppm at the time of disposal, and federal regulations require material contaminated by PCBs to be remediated to 1 ppm if it is in a "high occupancy area." ECF No. 140-2 at 32; see 40 C.F.R. § 761.3 (describing a "high occupancy area" as including "a school class room").

11

In September 2020, BSD contracted for air sampling to determine the impact of PCBs on the indoor air of the school. At that time, the State of Vermont recommended concentration of PCBs in schools to be less than 15 nanograms per cubic meter $(ng/m^3)$. The EPA's exposure advisory was 500 $ng/m^3$ for faculty and staff over the age of 19, and 100 $ng/m^3$ for children under age four (Building F had a daycare center). Air testing revealed that in Building A-E, most samples had PCB levels above 15 $ng/m^3$, with some samples showing concentrations of up to 300 $ng/m^3$. Samples from Building F ranged from 160 $ng/m^3$ in the childcare center to a high of 6,300 $ng/m^3$.

On September 16, 2020, the BSD Superintendent informed the school community that the campus would be closed "for at least the duration of this semester. This decision is directly related to the presence of PCBs in the air. . . ." ECF No. 171-75 at 2. The Superintendent's communication further explained that

> [w]hile we had initially been encouraged that the air testing was below the EPA guidelines of 500 nanograms per meter, the [Vermont Department of Health] levels of standards are 15 nanograms per meter and they made a strong recommendation that we not return to BHS or BTC without further diagnosing and mitigating the issue of PBC's [sic] in the air. The EPA was in agreement with this recommendation and noted that their standards often serve more of a starting point after which they recommend further testing and conversation. After listening to the recommendations, conversation, and concerns, I made the difficult decision to keep our building closed to in-person learning and, beginning immediately, any personnel

12

> non-essential to the testing, mitigation, or
> maintenance process.

*Id.* at 2-3. BHS rented a former Macy's department store to serve as an interim high school.

There are disputes of fact about the levels of PCBs that were ultimately discovered at the school, and whether those levels triggered mandatory remediation. Plaintiff's experts concluded that there were tens of thousands of square feet of PCB bulk product that was subject to remediation under EPA regulations. Specifically, mastic containing PCBs greater than 50 ppm covered nearly 100,000 square feet of building materials. Some samples of mastic tested as high as 41,000 ppm, 45,000 ppm, and 130,000 ppm. Plaintiff also submits that PCBs from this mastic migrated into the substrate below, which would have required remediation.

It is undisputed that building materials collected by consultants showed PCBs at high levels. In Building F, samples showed PCBs in caulk at 200,000 ppm and 275,000 ppm. The BSD Superintendent testified that, according to one consulting firm (Fuss & O'Neill), some PCB levels were higher than that firm had ever seen in nonindustrial sites. The Superintendent was also informed that PCBs were pervasive across the building.

BSD was presented with various cost estimates for remediation. On May 3, 2021, a Branch Manager from ATC opined

13

that "the actual costs for PCB building materials will be at the higher end of the estimates which have been provided ($7 to $12 mill)." ECF No. 171-85. He also acknowledged a host of uncertainties, including: "the scope of the building materials needed to be removed to meet the PCB in Air Guidance Value"; whether the interior spaces would meet the Vermont Department of Health air guidelines; and "the extent of long term PCB related Operations and Maintenance requirements such as periodic air sampling following renovation activities." ECF No. 171-85 at 2.

On May 4, 2021, the BSD Superintendent wrote a memorandum to the School Board recommending termination of the over $70 million renovation project that was envisioned prior to the discovery of PCBs. The Superintendent provided several reasons for his recommendation: (1) that the renovation project had been "reduced to the bare minimum due to cost estimates repeatedly exceeding the project budget"; (2) doubt about whether remediation of "extensive" PCB contamination would "reduce airborne PCBs to below the Vermont [Department of Health] values without extraordinary expense"; (3) a lack of money in the budget for the estimated $7 to $12 million cost of remediation; (4) lack of money to renovate BTC, which was "unusable in its current condition": (5) market conditions making it likely that future reductions in project scope would need to be considered; and (6) renovation of BHS, excluding BTC, would result in "an

14

improved building, but one that is still over 60 years old and will still contain PCBs to an extent that would require ongoing monitoring. The cost of this result would likely approach at least $90 million and leave us without a home for the Burlington Technical Center." ECF No. 134-45 at 2. On May 4, 2021, the School Board voted to accept the Superintendent's recommendation. BHS has been torn down, and a new school is being built.

Plaintiff is seeking approximately $135 million in compensatory damages from Defendants, based primarily on the difference between the cost of building a new BHS (over $200 million) and the cost of the previously-envisioned renovation project (approximately $70 million). The Complaint asserts six causes of action: public nuisance (Count I); private nuisance (Count II); strict liability – defective design (Count III); strict liability – failure to warn (Count IV); trespass (Count V); and negligence (Count VI). Defendants now move for summary judgment on all claims.

## Discussion

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law," and a dispute is "genuine"

15

if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court must "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003) (citation omitted).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant meets this burden, the nonmoving party must "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The nonmoving party "may not rely on mere conclusory allegations [or unsubstantiated] speculation" but must offer "some hard evidence showing that its version of the events is not wholly fanciful." *D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir. 1998).

## I.   Negligence

Defendants first move for summary judgment on Plaintiff's negligence claim, arguing a lack of duty. The Complaint alleges that "Defendants had a duty of care to protect others against unreasonable risks resulting from the use of their PCB and PCB-containing plasticizer products." ECF No. 1 at 49. Defendants argue that, under Vermont law, no duty exists unless Plaintiff

establishes both a special, legal relationship and foreseeable harm.

### A.   Legal Duty

Vermont law holds that a party claiming negligence must show "a legal duty owed by defendant to plaintiff." *O'Connell v. Killington, Ltd.*, 164 Vt. 73, 76 (1995). "[W]hether there is a cognizable legal duty that supports a particular tort action depends on a variety of public policy considerations and relevant factors." *Deveneau v. Wielt*, 2016 VT 21, ¶ 8 (quotation and brackets omitted). "Ultimately, whether a duty exists is a question of fairness that depends on, among other factors, the relationship of the parties, the nature of the risk, and the public interest at stake." *Hamill v. Pawtucket Mut. Ins. Co.*, 2005 VT 133, ¶ 6. "Absent a duty of care, an action for negligence fails." *Deveneau*, 2016 VT 21, ¶ 8.

Defendants argue that BSD lacked the requisite legal relationship with Monsanto because the two parties "did not transact or communicate with one another." ECF No. 134 at 19. The argument relies in large part on *Fleurrey v. Dep't of Aging & Indep. Living*, in which the Vermont Supreme Court stated that "alleging foreseeable harm cannot create a legal relationship between parties who, in the eyes of the law, are strangers, and then retroactively extend a duty from the one legal stranger to the other." 2023 VT 11, ¶ 16; *see also id.*, ¶ 17 (requiring "a

17

legal relationship linking one party to the other"). Defendants submit that Monsanto sold PCBs to third-party manufacturers, who then created the products used to build BHS, and that the lack of direct contact between BSD and Monsanto requires dismissal of the negligence claim.

The Vermont Superior Court recently considered essentially this same argument in an action brought against Defendants by the State of Vermont. *See State v. Monsanto Co.*, No. 23-CV-2606, 2024 WL 2818695 (Vt. Super. May 29, 2024) ("*Monsanto*"). The state court determined that "Monsanto reads *Fleurrey* far too broadly. *Fleurrey* and the cases cited therein present special circumstances not applicable here." *Id.* at *6. The court explained that "*Fleurrey* was a premises liability case brought under Restatement (Second) of Torts § 343, and its statement about legal relationships is properly understood as limited to those circumstances." *Id.* The state court also distinguished the cases upon which *Fleurrey* relied and explained its reasoning for allowing the State's negligence claim to proceed. *Id.* at *6-*7.

> [I]t is blackletter law that "[l]iability in negligence is not necessarily dependent on a preexisting privity in legal relationship between such persons." 65 C.J.S. Negligence § 43. Rather, "[t]he duty to exercise ordinary care to guard against injury which naturally flows as a reasonably probable and foreseeable consequence of an act does not depend upon contract, privity of interest, or the proximity of relationship but extends to remote and unknown persons." *Id.; see, e.g.*, Restatement (Second) of Torts § 4 cmt. (a) (1965) ("One who digs a ditch in a

18

> public highway is under a duty to set lights around it as night approaches so as to give travelers warning of its existence."). . . . Monsanto's reading of *Fleurrey* would upend well-settled negligence principles in scenarios involving, for example, a negligent driver who injures other drivers or pedestrians who are otherwise strangers. The complaint sufficient[ly] alleges that Monsanto owed a legal duty to the State of Vermont and its citizens despite the absence of a legal relationship.

*Id.* at *7.

When interpreting and applying state substantive law, federal courts must "give full weight to the decisions of the state's highest court, and . . . give due regard to the decisions of the state's lower courts." *Caronia v. Philip Morris USA, Inc.*, 715 F.3d 417, 449 (2d Cir. 2013). Here, the Court finds the Vermont Superior Court's reasoning in *Monsanto* persuasive. Negligence in Vermont, and specifically the element of duty, requires more than a strict examination of the parties' direct contacts. *See, e.g., Hamill*, 2005 VT 133, ¶ 6. Indeed, Vermont has long endorsed the principle that "'duty' is not sacrosanct in itself, but only an expression of the sum total of those considerations of policy which lead the law to say that the particular plaintiff is entitled to protection." *Langle v. Kurkul*, 146 Vt. 513, 519 (1986) (citations and internal quotation marks omitted).

In concluding that Monsanto's reading of the case law was too narrow, the Superior Court properly cited outside scholarly

19

sources, including the Restatement (Second) of Torts, to support its conclusion. *See Crawford v. Monsanto Co.*, No. 2:23-CV-752, 2024 WL 5629411, at *5 (D. Vt. Dec. 19, 2024) ("In an unbroken line of nearly 100 decisions, the Vermont Supreme Court has cited provisions of the Restatement (Second) as an authoritative source for the development of principles of tort law). Those sources, combined with the Vermont Supreme Court's broad pronouncements about how duty is determined, undermine Defendants' claim that duty in negligence depends exclusively on direct contact between parties.

Defendants contend that the *Monsanto* case is distinguishable, in part, because they are not arguing a lack of privity. The *Monsanto* court found that Defendants "apparently interpret[ed] *Fleurrey* as imposing a privity requirement," and addressed their arguments accordingly. 2024 WL 2818695, at *6. Defendants offer similar arguments here, and whether the question is characterized as requiring "privity" or direct communication generally, the Court adopts the analysis of the state court in *Monsanto.*

Defendants also claim no duty because, when BHS was constructed, they had no control over the PCBs. They contend that this lack of control puts them in a different legal position than, for example, the driver of the automobile in the *Monsanto* court's analogy. Vermont law, however, holds that the

20

term "duty" extends to those "entitled to protection." *Langle*, 146 Vt. at 519 (citation omitted). Plaintiff has offered evidence that Monsanto was uniquely positioned to know the potential dangers of PCBs, yet failed to properly alert its customers or the general public. The loss of physical control over the PCBs thus may not have cleared Monsanto of a legal duty to act with reasonable care. *See* Restatement (Second) of Torts § 4 cmt. (b) (1965) (explaining that the term duty "is also useful to describe the requirement that the actor, if he acts at all, must exercise reasonable care to make his acts safe for others"). While factual determinations will dictate whether Defendants are liable for breaching that duty, the Court declines to grant judgment as a matter of law under the duty element of Plaintiff's negligence claim.

### B.   Foreseeability

Defendants next argue no legal duty because the alleged harm suffered by Plaintiff was not foreseeable. Specifically, Defendants claim that it was not foreseeable in the 1960s that PCBs would volatilize at potentially hazardous levels. "Whether a defendant is negligent depends on whether his or her action was objectively reasonable under the circumstances; that is, the question is whether the actor either does foresee an unreasonable risk of injury, or could have foreseen it if he conducted himself as a reasonably prudent person." *Endres v.*

*Endres*, 2008 VT 124, ¶ 13 (citation and internal quotation marks omitted). "Foreseeability is an important consideration in tort law because, if the risk of harm is unforeseeable, potential tortfeasors cannot tailor their behavior to avoid those harms." *Zeno-Ethridge v. Comcast Corp.*, 2024 VT 16, ¶ 9.

Plaintiff submits that there are genuine issues of fact on the question of foreseeability. Plaintiff first cites the 1953 study that documented high levels of PCB emissions in a painted room. As noted above, Plaintiff contends that this testing should have prompted further research on paints and other materials. Instead, Monsanto's Medical Director, Dr. Kelly, concluded that testing was unnecessary since, specifically in households, it would be difficult to ascertain the level of exposure. Plaintiff highlights that rather than recommending a reduction in the sale of such products, Dr. Kelly recommended against testing for safety. After reviewing this same evidence, one recent court concluded that, "[i]n other words, Monsanto chose to remain ignorant of the potential health effects of its PCBs and, like an ostrich, buried its head in the sand." ECF No. 171-4 at 33 (*Rose et al. v. Pharmacia, LLC*, No. 18-2-58239-3 SEA, Wash. Superior Ct., May 28, 2025).

Plaintiff also argues that PCBs were incorporated into building materials at very high concentrations. Those concentrations are evidenced by readings taken years later at

22

BHS. While third-party manufacturers ultimately composed those building materials, the record shows that Monsanto lent its expertise to clients through the Plasticizer Council. The Plasticizer Council worked with customers, at times in their own production facilities, assisting with the incorporation of PCBs and product formulation. Plaintiff contends that the work of the Plasticizer Council, which was in existence by 1960, put Monsanto on notice that toxic PCBs were being used in various materials at high concentrations.

Plaintiff next cites the caulk studies from the 1960s showing that Aroclor 1254 evaporated out of caulk at higher rates than non-PCB plasticizers. Plaintiff concludes its argument by citing the various incidents that made Monsanto aware, or arguably should have made it aware, of the dangers of PCBs. Those incidents allegedly included the deaths of workers in the 1930s and the resulting study by Dr. Drinker at Harvard School of Public Health; animal studies in the 1930s showing toxic effects; workers in Indiana suffering liver damage after exposure to Aroclors in the 1950s; and studies conducted by the Navy in 1957 causing it to stop using Monsanto's product.

Defendants argue that to create a genuine factual dispute, the record must contain evidence – from before the construction of BHS – "that PCBs in caulk or other third-party building materials would volatilize or release from those materials at

levels posing health risks and requiring remediation," and that Monsanto knew of those risks. ECF No. 134 at 21. Defendants contend that Plaintiff's evidence falls short, showing only that, as of the 1960s, PCBs were known to be dangerous if either ingested or if faced daily at industrial levels.

Viewing the evidence in a light most favorable to Plaintiff, Monsanto had reason to know more. Vermont law has long held that "[f]oresight of harm is fundamental to a finding of negligence, but anticipation of the precise injury is not a requirement." *Dodge v. McArthur*, 126 Vt. 81, 83 (1966) (internal citation omitted). The Vermont Supreme Court has also observed that "the opportunity for knowledge, when available by the exercise of reasonable care, is the equivalent of knowledge itself. Knowledge essential to the invocation of legal duty, need not be actual; it may be implied, imputed and constructed from the circumstances. . . . [V]oluntary ignorance is culpable and affords no protection from legal liability." *Thompson v. Green Mountain Power Corp.*, 120 Vt. 478, 483 (1958) (citations omitted).

The record suggests that Monsanto had reason to further explore the dangers of PCBs. Monsanto knew that PCBs were toxic and that they caused harm to humans and animals. Dr. Kelly deflected the apparent suggestion that additional testing be performed with respect to non-industrial uses. Studies on both

24

paints and caulk, each of which would have been used to build non-industrial structures, showed volatilization and/or evaporation of PCBs. Whether Monsanto's knowledge of the risks of PCBs, or its "opportunity for knowledge," *id.*, was sufficient to render Defendants liable on a negligence claim may be determined by the finder of fact. On the current record, however, and viewing the facts in a light most favorable to the non-moving party, the Court finds that Defendants are not entitled to judgment on Plaintiff's negligence claim as a matter of law.

## II.  Strict Liability

Defendants next move for summary judgment on Plaintiff's strict liability claims. Count III of the Complaint alleges defective design. Count IV alleges failure to warn. Defendants' first argument is that the design defect claim improperly challenges inherent characteristics of PCBs, and that Plaintiff has failed to offer evidence creating a question of fact as to whether there was a reasonable alternative design. With respect to the failure to warn claim, Defendants argue that Monsanto had no duty to warn at the time of sale because the relative risks were not known, and that any such duty belonged to the third-party manufacturers who created the products used at BHS. Defendants also argue that Monsanto had no post-sale duty to warn of newly identified risks.

25

### A.    Design Defect

"To establish strict liability in a products liability action, a plaintiff must show that the defendant's product (1) is defective; (2) is unreasonably dangerous to the consumer in normal use; (3) reached the consumer without undergoing any substantial change in condition; and (4) caused injury to the consumer because of its defective design." *Farnham v. Bombardier, Inc.*, 161 Vt. 619, 620 (1994) (citing Restatement (Second) of Torts § 402A (1965); *Zaleskie v. Joyce*, 133 Vt. 150, 154-55 (1975) (adopting § 402A "strict product liability" in Vermont)). "A product is defective if it is not 'safe for normal handling and consumption.'" *Id.* (quoting Restatement (Second) of Torts § 402A cmt. h). It is unreasonably dangerous if it is "dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics." *Id.* (quoting Restatement (Second) of Torts § 402A cmt. i).

Defendants argue that a product cannot be defectively designed where the alleged defect is a characteristic of the product itself. *See, e.g., Godoy ex rel. Gramling v. E.I. du Pont de Nemours & Co.*, 768 N.W.2d 674, 685 (Wis. 2009). As one federal court stated, "PCBs cannot be PCBs without the presence of PCBs themselves, along with their inherent characteristics." *Town of Lexington v. Pharmacia Corp.*, 133 F. Supp. 3d 258, 270

26

(D. Mass. 2015). In *Town of Lexington,* the court concluded that "Lexington must point to some aspect of Pharmacia's design of PCBs, not the mere presence of PCBs, to sustain its claim for design defect." *Id.*

Plaintiff contends that the product here is not merely raw PCBs, but the plasticizers formulated by Monsanto. *See Godoy*, 768 N.W.2d at 682 ("The identity of the product is essential to an analysis of its design."). A common mixture present at BHS was Aroclor 1254, which consisted of biphenyl and 54% chlorine by mass. Monsanto produced other Aroclors as well, including Aroclor 1016, Aroclor 1242, and Aroclor 1248.[1] Aroclor 1254 was one of Monsanto's more volatile compounds. Tracking the legal standard under Vermont law, these facts underlie such questions as whether Aroclor 1254, as formulated, was "unreasonably dangerous to the consumer in normal use," *Farnham*, 161 Vt. at 620, and whether it was dangerous "beyond that which would be contemplated by the ordinary consumer who purchases it," *id.*

Plaintiff argues that whether PCBs are "inherent" to plasticizers is a question of fact in dispute. While PCBs proved useful for plasticizers, Plaintiff claims they were not

---

[1] The four digit number following the word "Aroclor" described the characteristics of the product. The first number denoted the raw material, with a "1" indicating 100% biphenyl. A "2" as the second number indicated that the product was distilled, while the last two numbers represented the percentage of chlorine.

essential since alternatives were available in the market prior to the 1960s. Consequently, replacing PCBs in plasticizers would not turn the plasticizer into a different product. *Compare Godoy*, 768 N.W.2d at 684 (concluding that removal of lead from a product identified as lead carbonate pigment "would transform it into a different product") *with MacPherran v. Bos. Sci. Corp.*, No. 20-CV-766-JDP, 2020 WL 7061044, at *4 (W.D. Wis. Dec. 2, 2020) ("Because pelvic mesh products can be made with different types of mesh, use of a non-polypropylene mesh would not turn the product into something else.").

This discussion of alternatives leads to Defendants' next argument, which is that Plaintiff has not offered an alternative design for PCBs. Although Vermont law does not require such a showing, Defendants contend that to show a design was unreasonable, the complaining party must show a reasonable alternative. As with the inherent characteristic discussion, this analysis hinges in large part on the description of the product. If the product is the PCBs themselves, it makes little sense to require an alternative design since it is those very PCBs that are the alleged source of harm. Instead, Plaintiff intends to submit evidence that Monsanto had alternatives available, and that despite its growing knowledge of the dangers of PCBs, chose to continue selling PCBs to its customers. The Court finds that, viewing the facts in a light most favorable to

28

Plaintiff, there are genuine issues of material fact in dispute. The finder of fact should therefore determine whether there were, in fact, viable alternatives available, and whether the design of plasticizers marketed to Monsanto's customers were, under Vermont law, defective.

## B.    Failure to Warn

Defendants next move for summary judgment on Plaintiff's strict liability failure to warn claim. In Vermont, a manufacturer has "a duty to warn users and consumers when it knows or has reason to know of dangers inherent in the product at the time the product is sold, Restatement (Second) of Torts § 402A cmt. k, or when the product is dangerous to an extent beyond that which would be contemplated by an ordinary consumer." *Webb v. Navistar Int'l Transp. Corp.*, 166 Vt. 119, 127 (1996). Defendants argue that Plaintiff's claim fails in three respects: (1) the evidence does not demonstrate that the risks of PCBs in the applications at issue were known when products were sold in the 1960s; (2) Monsanto sold to sophisticated purchasers who incorporated PCBs into other products, and its duty to warn extended only to those purchasers; and (3) to the extent Plaintiff is asserting a post-sale duty to warn, that claim is not viable under Vermont law.

### 1. Knowledge of Inherent Dangers

As the Court discussed previously in the context of Plaintiff's negligence claim, there is evidence that Monsanto was aware of the inherent dangers of PCBs prior to the construction of BHS. Briefly stated, Monsanto knew that PCBs caused harm in humans and animals, and studies showed that PCBs can volatilize and/or evaporate. Whether Monsanto had "reason to know of dangers inherent in the product at the time the product [was] sold" must ultimately be determined by the finder of fact. *Webb*, 166 Vt. at 127. Viewing the facts in a light most favorable to Plaintiff, Defendants are not entitled to summary judgment based on a lack of knowledge by Monsanto at the time of sale.

### 2.   Failure to Provide Adequate Warnings

With respect to their duty to warn, Defendants submit that Monsanto sold PCB-based products to sophisticated manufacturers, who in turn developed their own end use products. They also contend that they provided those manufacturers with appropriate warnings and had no further duty to warn. This argument asks for application of the "sophisticated purchaser" or "bulk supplier" doctrine, discussed below.[2] "As an affirmative defense,

---

[2]  Defendants propose that, for present purposes, these doctrines are essentially synonymous. ECF No. 134 at 28. Plaintiff does not challenge that assertion, and some cases treat the two doctrines as essentially the same. *See, e.g., In re TMJ Implants Prods. Liab. Litig.*, 97 F.3d 1050, 1054 (8th Cir. 1996).

[Defendants] bear[] the burden of proof in demonstrating that the bulk supplier doctrine is applicable here." *Town of Westport v. Monsanto Co.*, No. CV 14-12041, 2017 WL 1347671, at *9 (D. Mass. Apr. 7, 2017), *aff'd*, 877 F.3d 58 (1st Cir. 2017).

Under the bulk supplier doctrine, "[b]ulk suppliers of products to manufacturers, who are sophisticated users, have no duty in negligence, strict liability, or breach of warranty to warn ultimate purchasers of the manufacturer's product." *In re TMJ Implants Prods. Liab. Litig.*, 872 F. Supp. 1019, 1029 (D. Minn. 1995) (quoting American Law of Products Liability 3d § 5.23 (Matthew J. Canavan, ed. 1994)). "The doctrine is a recognition of the difficulties peculiar to suppliers of raw materials and component parts, in discharging their duty to warn those ultimately exposed to the hazards posed by their products." *See* Am. L. Prod. Liab. 3d § 33:26. "Justification for absolving a supplier from liability to ultimate users of the end-product is strongest . . . when a supplier sells to a knowledgeable manufacturer raw materials in bulk, which are not themselves inherently dangerous and which are substantially changed during the manufacturing process before resale to consumers, and when the supplier has little or no role in the design of the end product." *In re Silicone Gel Breast Implants Prods. Liab. Litig.*, 996 F. Supp. 1110, 1114 (N.D. Ala. 1997).

31

"Section 388 of the Restatement (Second) of Torts sets forth the basis for the bulk supplier/sophisticated purchaser rule." *Kealoha v. E.I. du Pont de Nemours & Co.*, 82 F.3d 894, 901 (9th Cir. 1996). Comment n to Section 388 notes that when a product is supplied for the use of others, "the question may arise as to whether the person supplying the chattel is exercising that reasonable care, which he owes to those who are to use it, by informing the third person through whom the chattel is supplied of its actual character." Restatement (Second) of Torts § 388, comment n (1965). Courts have interpreted comment n as "relieving bulk suppliers of their duty to warn end users of a product as long as the bulk supplier has 'reasonable assurance that the information will reach those whose safety depends upon their having it.'" *Town of Westport,* 2017 WL 1347671, at *9 (quoting *Hoffman v. Houghton Chem. Corp.*, 751 N.E. 2d 848, 856 (Mass. 2001)).

There is no indication in the briefing that Vermont has adopted either the sophisticated purchaser or the bulk supplier doctrine. Even assuming such adoption, courts have determined that the question of reasonable assurance is fact intensive, and that the relevant factors may include:

> (1) the dangerous condition of the product; (2) the purpose for which the product is used; (3) the form of any warnings given; (4) the reliability of the third party as a conduit of necessary information about the product; (5) the magnitude of the risk involved; and

32

(6) the burden imposed on the supplier by requiring that he directly warn all users.

*Genereux v. Am. Beryllia Corp*., 577 F.3d 350, 374 (1st Cir. 2009) (quoting *Hoffman*, 751 N.E. 2d at 856).

Here, there are disputes of fact on several issues relating to the bulk supplier doctrine. First, the parties dispute whether the information provided to Monsanto's customers was adequate. Defendants note that certain warnings were provided, including warnings about potential toxic effects of prolonged exposure at high temperatures. A technical brochure from the 1940s warned that Aroclors should not be used in connection with the food industry. ECF No. 134-3 at 32. Plaintiff submits that in the early 1960s, Monsanto was nonetheless promoting PCBs as a chemical that "stubbornly refuse[s] to volatilize." ECF No. 171-16 at 2. It further described Aroclors as a product that was "nonoxidizing, inert, permanently thermoplastic, [and] of low volatility" that did not "evaporate, hydrolyze, or oxidize." ECF Nos. 171-10 at 8, 171-18 at 2. Factual disputes remain about whether those statements were inconsistent with Monsanto's knowledge of PCBs, and the dangers of PCBs in non-industrial settings, at that time.

The bulk supplier doctrine transfers the responsibility to the intermediary vendee, "particularly the large industrial company . . . to provide adequate safety measures for its end

users." *Town of Westport*, 2017 WL 1347671, at *9. This transfer assumes that the vendee is adequately informed about the product it is purchasing, and/or has the capacity to conduct its own testing of the product. *See Willis v. Raymark Indus., Inc.*, 905 F.2d 793, 797 (4th Cir. 1990) (purchaser must have "equal knowledge" of the product's dangers). The undisputed factual record does not demonstrate that Monsanto's customers had either adequate information about PCBs or the testing capabilities to evaluate the safety of PCBs.

Plaintiff also contends that Monsanto was directly involved with its customers through the Plasticizer Council. While Defendants allege that members of the Plasticizer Council offered no input on the formulation of end use products, there is evidence that Monsanto worked with customers "conducting trials, evaluating effects, [and] making modifications . . . until application of a Monsanto product [was] completely ready to run on a steady, mass production basis." ECF No. 171-28 at 10. This evidence calls into question whether the responsibility for providing warnings to consumers transferred fully to "sophisticated" customers when, insofar as PCBs were concerned, Monsanto's own personnel were directly involved in product testing and development.

Application of the bulk supplier doctrine is a fact-specific endeavor. *See Genereux*, 577 F.3d at 374. On the current

34

factual record, the Court cannot find that Defendants are entitled to protection from that defense. Specifically, the dangerousness of the product, the form and extent of warnings provided, the reliability of (unidentified) third parties to transmit necessary information to consumers, and the magnitude of the risk involved are all genuine issues in dispute. *See id.* The motion for summary on Plaintiff's strict liability failure to warn claim is therefore denied.[3]

## III. Proximate Cause

Defendants move for summary judgment on all causes of action for lack of proximate cause. Their argument is that Monsanto did not make, sell, or install the end use products used in the construction of BHS. Defendants also argue that they did not fail to replace the PCB-containing materials at BHS. They contend that these two, independent superseding causes, together with a lack of foreseeable injury, compel the Court to find a lack of proximate cause as a matter of law.

"The law of proximate cause calls for a causal connection between the act for which the defendant is claimed to be responsible . . . and the resulting flow of injurious

---

[3] Defendants move for summary judgment on Plaintiff's claims "to the extent [Plaintiff] seeks to impose a post-sale liability [for failure to warn] on Defendants." ECF No. 134. Because Plaintiff's opposition memorandum does not address that argument, the Court assumes Plaintiff is not asserting such a claim.

consequences." *Rivers v. State*, 133 Vt. 11, 14 (1974). "Foreseeability . . . is not a factor in the determination of proximate cause." *Id.* (citing *Dodge*, 126 Vt. at 83). If foreseeability was a factor, the Court has found genuine issues of fact in dispute regarding Monsanto's knowledge of the potential for harm. The Court therefore turns to Defendants' claims of superseding causes.

It is undisputed that Monsanto sold PCBs to customers for use in end products such as paint and caulk. That chain of events does not necessarily relieve Defendants of any responsibility for the harm those PCBs allegedly caused. "[I]f the initial negligence creates a situation making it likely that some other force or action will occur and bring about harm, responsibility remains with the original actor." *Dodge*, 126 Vt. at 84; *see also Citibank, N.A. v. City of Burlington*, No. 2:11-CV-214, 2012 WL 2050730, at *6 (D. Vt. June 7, 2012) ("Even if an intervening event occurs, it does not necessarily relieve the original tortfeasor of liability.").

Plaintiff's evidence shows that Monsanto was aware of its PCB formulations, including the Aroclor series, being used in a host of other products. As discussed above, there are disputes of fact about whether Monsanto knew of the dangers of those formulations, and whether it adequately warned either its customers or the public of those dangers. The Court has already

36

found that Monsanto cannot escape liability at summary judgment based on the assertion that its sophisticated customers bore the entire burden of warning about PCBs. The evidence also suggests that Monsanto was uniquely knowledgeable about PCBs and the attendant hazards.

Defendants argue that Monsanto's consumers, the alleged sophisticated buyers, had their own duty to test end use products. While that may be generally true, it does not necessarily apply to tests for PCB toxicity, particularly when those buyers had little reason to expect harm from PCB volatilization. In fact, Plaintiff submits that Monsanto marketed Aroclor plasticizers as unlikely to volatilize or evaporate. ECF Nos. 171-16 at 2, 171-10 at 8, 171-18 at 2. Moreover, the concentration level of Aroclor used in the final, end use products is arguably irrelevant, since incorporation of a high concentration by a manufacturer does not shift liability if that manufacturer was insufficiently warned. *See Paton v. Sawyer*, 134 Vt. 598, 601 (1976) (original negligent actor "shall still not be liable if the second actor, *once aware of the particular danger involved*, knowingly and negligently proceeds") (emphasis supplied).

The Court also declines to grant summary judgment based on Plaintiff's own actions over the decades since BHS was built. Defendants argue that under Vermont law, Plaintiff had a duty to

37

protect students from danger. *See* 16 V.S.A. § 834 ("Each school district and its employees owe its students a duty of ordinary care to prevent the students from being exposed to unreasonable risk, from which it is foreseeable that injury is likely to occur."). That duty, they contend, extended to learning about the dangers of PCBs in schools and taking timely and appropriate remedial action. Defendants submit that notices from the EPA and others should have put Plaintiff on notice that action was necessary, and the alleged failure to take such action constituted a superseding cause.

The undisputed evidence is insufficient for the Court to conclude that Plaintiff's actions with respect to PCB remediation qualified as a superseding, intervening cause of harm. The EPA announced in 1979 that further manufacture of PCBs was prohibited. Use of PCBs in sealants or coatings was stopped in 1994. Defendants cite press reports of PCBs being found in schools in the late 1990s and early 2000s. There is no evidence that Plaintiff or its representatives were aware of, or were required to be aware of, the EPA's pronouncements and the cited press accounts.

In 2009, over 40 years after BHS was built, the EPA issued guidance to "building owners and school administrators" about steps they "should take to reduce exposures to PCBs that may be found in caulk in many buildings constructed or renovated

between 1950 and 1978." ECF No. 134-20 at 2. The recommendations included simple measures such as increasing ventilation and frequent handwashing, as well as "consider[ing] testing to determine if PCB levels in the air exceed EPA's suggested public health levels." *Id.* at 3. There was no mandate for PCB testing or remediation. And, as Plaintiff now argues, by that time the damage was most likely done.

"Although proximate cause ordinarily is characterized as a jury issue, it may be decided as a matter of law where the proof is so clear that reasonable minds cannot draw different conclusions or where all reasonable minds would construe the facts and circumstances one way." *Collins v. Thomas*, 2007 VT 92, ¶ 8 (2007) (internal quotations marks and citation omitted). In this case, the factual record before the Court, viewed in a light most favorable to the Plaintiff, is not "so clear" that reasonable minds could not draw different conclusions. *Id.*  The Court therefore finds Defendants are not entitled to summary judgment based on a lack of proximate cause.

## IV.   Trespass

Defendants next move for summary judgment on Count V of the Complaint, which alleges trespass. Defendants argue they cannot be held liable for trespass because: (1) Plaintiff purchased the materials used to build BHS and therefore consented to the presence of those materials on its property; (2) Monsanto did

39

not control the materials since they were manufactured and sold by third parties; and (3) trespass applies only to tangible objects, and PCBs emissions are intangible. Plaintiff contends that Defendants are wrong on each point under Vermont law.

Trespass in Vermont requires intentionally entering, or causing a thing to enter, the land of another. *Nesti v. Vt. Agency of Transp.*, 2023 VT 1, ¶ 24; *Canton v. Graniteville Fire Dist. No. 4*, 171 Vt. 551, 552 (2000) (citing Restatement (Second) of Torts § 158(a) (1965)). That entry must be without permission. *Nesti*, 2023 VT 1, ¶ 24 ("[t]respass involves unprivileged entry").

The first issue raised by Defendants is whether Plaintiff consented to the entry of PCBs onto its property. According to the Restatement (Second) of Torts, "consent to conduct of another is effective for all consequences of the conduct and for the invasion of any interests resulting from it" unless "the person consenting to the conduct of another is induced to consent by a substantial mistake concerning the nature of the invasion of his interests or the extent of the harm to be expected from it and the mistake is known to the other or is induced by the other's misrepresentation[.]" Restatement (Second) of Torts § 892B (1979); *see also id.* § 167 (explaining that section 892B applies to "entry or remaining on land[]"); *see Addison Cent. Sch. Dist. v. Monsanto Co.*, No. 2:23-CV-00164,

40

2024 WL 4348194, at *10 (D. Vt. Sept. 30, 2024) (citing

Restatement (Second) of Torts). In *Addison Central School*

*District*, this Court allowed the plaintiffs' trespass claim to

proceed, concluding that

> Plaintiffs have plausibly alleged Old Monsanto
> knowingly sold PCB-containing products that were
> unsafe, knew those products were likely to be used in
> constructing Plaintiffs' schools, and concealed the
> fact that its products were harmful. Accepting
> Plaintiffs' allegations as true, they have plausibly
> alleged they did not consent to the PCB contamination
> because they were misled regarding the toxicity of
> PCBs and thus Defendants' invasion was unauthorized.

2024 WL 4348194, at *10. Here, the factual record at summary

judgment allows the Court to follow that same reasoning. Viewing

that record in a light most favorable to Plaintiff, Monsanto

failed to alert customers and consumers to the dangers inherent

in PCBs. Consequently, when Plaintiff purchased materials for

the construction of BHS, it did not consent to the presence of

PCBs on its property.

Defendants also argue they cannot be held liable for

trespass because they did not control the PCBs after they were

sold. Under the Restatement, "[i]t is enough that an act is done

with knowledge that it will to a substantial certainty result in

the entry of the foreign matter." Restatement (Second) of Torts

§ 158 cmt. i. The Court previously allowed Plaintiff's trespass

claim to proceed because "[t]he Complaint alleges that Monsanto

knew its PCBs were substantially certain to enter School

41

property." *Burlington Sch. Dist. v. Monsanto Co.*, No. 2:22-CV-215, 2023 WL 4175344, at *7 (D. Vt. June 26, 2023) (citing *Illinois ex rel. Raoul v. Monsanto Co.*, No. 22 C 5339, 2023 WL 3292591, at *2 (N.D. Ill. May 5, 2023) ("The State has alleged that Monsanto knew that the intended uses of its products would cause PCBs to invade Illinois['] natural resources, due to the laws of physics and chemistry.")); *In re Methyl Tertiary Butyl Ether (MTBE) Prod. Liab. Litig.*, 725 F.3d 65, 120 (2d Cir. 2013) (upholding trespass verdict where jury found it "was substantially certain that [Exxon's] gasoline containing MTBE would leak from the gasoline distribution system and enter groundwater")). While Defendants argue that, to be liable for trespass, Monsanto must have known with substantial certainty that the PCBs would enter BHS specifically, they cite no case law for support.

As it did previously, the Court finds Plaintiff's trespass claim may proceed. The record at summary judgment shows that Monsanto knew, with substantial certainty, that its PCBs would be used in caulk, paint, and other building materials. Viewing the facts in Plaintiff's favor, Monsanto also knew that those PCBs carried health risks to those who inhabited such buildings. One such building was BHS. The Court thus declines to award summary judgment on the basis of Defendants' "control" argument.

42

Defendants' final argument with respect to trespass is that PCBs are not tangible and did not have a physical impact on the property. The Court previously noted that

> [t]he Vermont Supreme Court has expressly declined to determine whether the presence of airborne particles constitutes a trespass. *John Larkin, Inc. v. Marceau*, 2008 VT 61, ¶ 14 ("We leave for another day the question of whether the intrusion of airborne particulates may ever be a trespass, and, if so, what impact is required to sustain such an action."). The "modern view" in trespass law is to allow an action based on intangible entries. *See Stephens v. Koch Foods, LLC*, 667 F. Supp. 2d 768, 795 (E.D. Tenn. 2009).

*Burlington Sch. Dist.*, 2023 WL 4175344, at *7 n.2 (D. Vt. June 26, 2023); *see also Marceau*, 2008 VT 61, ¶ 14 (declining to take "a hard-line position that the dispersion of airborne particulates on property may never be actionable as a trespass, irrespective of the nature of the invasion or the right invaded"). In *Marceau*, the Vermont Supreme Court chose not to resolve the question because the plaintiff had "failed to demonstrate any impact on its property from Marceau's pesticides." 2008 VT 61, ¶ 14.

Here, Plaintiff has submitted evidence to show that PCBs not only emitted into the air but were also present in surface materials and other physical parts of BHS, requiring either removal or remediation. "Although a close question," the Court finds Plaintiff's proof of such substantial damage entitles it to present a trespass claim to a trier of fact. *Addison Cent.*

*Sch. Dist.*, 2024 WL 4348194, at *11 (allowing trespass claim to overcome motion to dismiss where plaintiffs alleged "property damage so severe that it will require, in some instances, demolition and replacement of entire buildings"). Defendants' motion for summary judgment on Plaintiff's cause of action for trespass is denied.

## V.   Nuisance

Asserting arguments similar to those raised with respect to trespass, Defendants move for summary judgment on Plaintiff's public and private nuisance claims (Counts I and II, respectively). Specifically, Defendants argue they cannot be held liable because Monsanto did not control the PCBs that entered BHS, and because PCBs are "imperceptible." ECF No. 134 at 42. As with the trespass claim, the Court has previously addressed some of the legal issues raised by these causes of action.

Under Vermont law, "[a] private nuisance is . . . defined as a substantial and unreasonable interference with a person's interest in the use and enjoyment of land." *Jones v. Hart*, 2021 VT 61, ¶ 26. "[T]o be considered a public nuisance, an activity must disrupt the comfort and convenience of the general public by affecting some general interest." *Napro Dev. Corp. v. Town of Berlin*, 135 Vt. 353, 357 (1977). The Court previously acknowledged that "[t]he Vermont Supreme Court has not addressed

44

either type of claim in the context of a product manufacturer defendant." *Burlington Sch. Dist.*, 2023 WL 4175344, at *4.

The Restatement provides that "[o]ne is subject to liability for a nuisance caused by an activity, not only when he carries on the activity but also when he participates to a substantial extent in carrying it on." Restatement (Second) of Torts § 834 (1979). A claim for private nuisance may arise where "one person's acts set in motion a force or chain of events resulting in the invasion." Restatement (Second) of Torts § 824 cmt. b (1979). For public nuisance claims, Vermont follows Section 821B of the Restatement, *Howe Cleaners, Inc.*, 2010 VT 70, ¶ 49, which calls for liability when the "conduct is of a continuing nature or has produced a permanent or long-lasting effect, and, as the actor knows or has reason to know, has a significant effect upon the public right." Restatement (Second) of Torts § 821B (1979).

A "substantial participation" standard applies to both private and public nuisance claims. Restatement (Second) of Torts § 834 & cmt. a (1979). The Court previously held it "plausible that Monsanto 'substantially participated' in the creation of a hazardous condition that deprived BSD of the enjoyment of its property and significantly infringed upon the public right." *Burlington Sch. Dist.*, 2023 WL 4175344, at *5. The evidence at summary judgment, viewed in a light most

favorable to the Plaintiff, continues to support Plaintiff's argument that Defendant engaged in such "substantial participation."

As the Court noted in its prior ruling, at least one state court opinion rejected the control argument now asserted by Defendants. In *State v. 3M Co.*, No. 547-6-19 CNCV, 2020 WL 13368654, at *3 (Vt. Super. May 28, 2020), the Vermont Superior Court declined to accept the defendants' argument that they could not be liable for the release of PFAS chemicals because they "relinquished control when they sold the products."

> 3M cites no Vermont caselaw supporting this argument, and the State accurately points to language in the Restatement suggesting that a defendant may be held liable for harm that continues after that defendant's actions have ceased, and that "substantial participation" in a chain of actions can be sufficient. Restatement (Second) of Torts § 834 and cmts. d and e (1979). Other courts have rejected similar claims by manufacturers. *See, e.g., In re Methyl Tertiary Butyl Ether (MTBE) Prod. Liab. Litig.*, 725 F.3d 65, 121 (2d Cir. 2013).

*Id.* That court has since affirmed its reasoning in the context of Monsanto and PCBs. *Monsanto*, 2024 WL 2818695, at *7 ("Monsanto offers no persuasive basis to reach a different result here."); *see also Addison Cent. Sch. Dist.*, 2024 WL 4348194, at *8.

At summary judgment, the Court notes that the facts are largely as alleged in the Complaint on the question of control. Indeed, there is no dispute that Monsanto sold its plasticizers

to third parties, which then incorporated them into final products. Those sales, however, do not deprive Plaintiff of its nuisance claims, and the Court will not grant judgment to Defendants as a matter of law on the basis of their "control" argument.

Defendants also contend that there can be no nuisance claim because PCBs are imperceptible. For support, Defendants cite *Myrick v. Peck Electric Company*, which found that aesthetic objections to solar panels could not form the basis of a nuisance claims. 2017 VT 4, ¶ 7 (concluding that "[t]he judicial branch is ill-suited to be an arbiter of style or taste"). *Myrick* said nothing about chemicals or toxic vapors. Moreover, to hold that a chemical cannot create a nuisance because it cannot be seen or smelled would ignore the undisputed fact that the human body can nonetheless be impacted by the presence of PCBs, and that negative health consequences may follow. Defendants' motion for summary judgment on Plaintiff's nuisance claims is denied.

## VI.  Damages

Finally, Defendants argue that Vermont law forecloses Plaintiff's claims for compensatory or punitive damages. With respect to compensatory damages, Defendants submit that the appraised value of BHS was $0 and that, at most, compensatory damages are capped at the $12 million cost of remediation. They

47

also contend that Plaintiff's evidence does not clear the high threshold for an award of punitive damages. Plaintiff argues that Defendants are misreading Vermont law with regard to compensatory damages, and that the facts in this case could lead a reasonable jury to impose punitive damages.

### A.    Compensatory Damages

Plaintiff calculates its compensatory damages as the difference between the cost of the new high school (over $200 million) and the cost envisioned for renovation of BHS prior to the discovery of PCBs (over $70 million). Defendants contend that this methodology is contrary to Vermont law, and that Plaintiff is limited to, at most, the proposed cost of remediation.[4] For support, Defendants rely on the Vermont Supreme Court's holding in *Langlois v. Town of Proctor*, 2014 VT 130. *Langlois* noted that in the context of a tort action for damage to real property, it previously stated the rule for damages as follows:

> If the injury is temporary in the sense that restoration can cure the harm, the reasonable cost of repair may serve the need and provide adequate and fair compensation. If the damage is permanent and beyond full repair, the variance in value of the property before and after the injury often affords the better guide to a just award. It all depends upon the

---

[4] The Court addressed this issue previously in ruling on Defendants' motion to exclude the testimony of Plaintiff's damages expert, Christine Lee. ECF No. 196. The Court largely repeats its analysis here.

character of the property and the nature and extent of the injury.

2014 VT 130, ¶ 41 (quoting *Bean v. Sears, Roebuck & Co.*, 129 Vt. 278, 282 (1971)). *Langlois* acknowledged that "our explanation in *Bean* that '[i]t all depends up on the character of the property and the nature and extent of the injury' is not especially descriptive, but in that opinion we also refer to 'reasonable cost of repair' and a 'just award.'" *Id.*, ¶ 43 (quoting *Bean*, 129 Vt. at 282). The court clarified that "[o]ur touchstone for determining damages, in tort as in contract, is reasonableness." *Id.*

Defendants argue that the calculation of damages is limited to the measures specifically set forth in *Bean* and *Langlois*: either the cost of repair or the difference in the value of the property before and after the harm. Defendants also claim there is no evidence to dispute their assertion that remediation could have completely eradicated PCBs at BHS. ECF No. 134 at 44 ("Because the undisputed evidence confirms that restoration could cure the harm . . . ."). Characterizing that harm as "temporary," they argue that Plaintiff's damages amount to, at most, the remediation estimate of up to $12 million. *Id.*

As a matter of law, the Court finds that *Langlois* was not as rigid as Defendants depict. *Langlois* confirmed the holding in *Bean*, but also credited the defendant's contention that taking

49

the value of the building into account is part of "the general inquiry on the reasonableness of damages." *Id.* The Vermont Supreme Court's flexibility on that point illustrates that while *Bean* provided a basic framework for certain types of injuries, that framework did not strictly limit what a court and a jury may consider when determining a reasonable damages award. Consequently, Vermont law does not prohibit other, "reasonable" approaches to calculating damages.

In this case, a jury could find a different approach reasonable given the nature of both the property and the alleged injury. The property – a large, public high school – is significantly different in character from those at issue in *Langlois* (a two-story commercial/residential building) and *Bean* (a farm). The nature and extent of the injury is also distinguishable. *See Sullivan v. Saint-Gobain Performance Plastics Corp.*, No. 5:16-CV-125, 2021 WL 8344552, at *4 (D. Vt. Jan. 26, 2021) ("*Langlois* concerned the discharge of water which — while very damaging in the wrong location — is not a contaminant."). PCBs allegedly threatened the health of students, faculty, and staff on the BHS campus. The BSD determined that renovation was no longer viable after the discovery of PCBs, and that the campus needed to be torn down. The reasonableness of the BSD's decision, and the associated damages, may be evaluated by the trier of fact.

50

Turning to the facts, and accepting *arguendo* Defendant's argument on the law, the Court finds there are genuinely disputed material questions. For example, Plaintiff argues that the stated cost range for remediation, $7 million to $12 million, did not include an estimated $50 million to remediate PCBs at BTC. Furthermore, the Superintendent testified that PCBs were said to be pervasive across BHS, and that remediation did not guarantee the lowering of PCB contamination to acceptable levels. Accordingly, it is not clear from the record that PCBs at BHS were, in fact, temporary.

If the damage is considered permanent and the measure of damages is linked to the property's value, Defendants' own expert acknowledged that BHS, as a public school building, would "not typically [be] sold on the open market." ECF No. 144-2 at 10 (report of Defendants' expert Brian C. Underwood). That same expert opined that BHS had zero use value even before the discovery of PCBs. If the Court were to accept Defendants' reading of *Langlois* and its expert's use valuation, the damages for permanent harm would arguably also be zero. Because *Langlois* made clear that the "touchstone for determining damages, in tort as in contract, is reasonableness," the Court finds the jury may consider other measures of damages, including the cost of replacement. 2014 VT 130, ¶ 43; *see Chase v. Hoosac Tunnel & W. R. Co.*, 85 Vt. 60 (1911) (explaining that when property is

51

damaged, "[t]he law seeks to make the injured party whole; to restore him, so far as can be done by an award of damages, to his former position"); Dobbs, *Handbook on the Law of Remedies*, § 5.1 (1973) (arguing that the right of recovery should be without limitation). Defendants' motion for summary judgment on Plaintiff's request for compensatory damages is denied.

### B.    Punitive Damages

Defendants argue that Plaintiff cannot receive punitive damages because there is no evidence of an intent to harm. In Vermont, "[p]unitive damages are reserved for especially egregious conduct." *Connors v. Dartmouth Hitchcock Med. Ctr.*, 12 F. Supp. 3d 688, 695 (D. Vt. 2014). "[T]he purpose of punitive damages is to punish conduct that is morally culpable to the degree of outrage frequently associated with crime." *Fly Fish Vermont, Inc. v. Chapin Hill Estates, Inc.*, 2010 VT 33, ¶ 19 (citing *Brueckner v. Norwich Univ.*, 169 Vt. 118, 129 (1999)). To be eligible for an award of punitive damages, Plaintiff's evidence must show "wrongful conduct that is outrageously reprehensible," and "malice, defined variously as bad motive, ill will, personal spite or hatred, reckless disregard, and the like." *Id.* ¶ 18. The "conduct need not only be wrongful, but truly reprehensible." *Id.* ¶ 19; *see Beaudoin on Behalf of New England Expedition Ltd. P'ship II v. Feldman*, 2018 VT 83, ¶ 18.

52

Plaintiff's briefing highlights some of the evidence it intends to introduce at trial, which reportedly includes: that Monsanto knew of the systemic toxic effects of PCBs as early as the 1930s; that its own medical staff confirmed in the 1950s that Aroclors are toxic yet discouraged further testing; that the Navy informed Monsanto that it would no longer use its PCB product; and that notes from a Monsanto meeting show consideration of "sell[ing] the hell" out of PCBs and "do[ing] nothing else." ECF No. 171-55 at 6. The Court finds that the evidence, when viewed in a light most favorable to the Plaintiff, creates a genuine issue of material fact on the question of punitive damages.

Vermont allows a punitive damages award when the defendant "acted, or failed to act, in conscious and deliberate disregard of a known, substantial and intolerable risk of harm to plaintiff, with the knowledge that the acts or omissions were substantially certain to result in the threatened harm." *Fly Fish Vermont, Inc.*, 2010 VT 33, ¶ 25. Defendants contend that Monsanto's knowledge of PCB toxicity prior to the construction of BHS did not meet this standard. Some of Plaintiff's evidence, however, pre-dates the construction of BHS. The evidence also suggests that Monsanto may have prioritized profits over public health despite its knowledge that PCBs posed certain threats. The Court finds that a reasonable jury, if presented with such

53

evidence, could find both reprehensible conduct and sufficient bad motive to support an award of punitive damages.

## Conclusion

For the reasons set forth above, Defendants' motion for summary judgment (ECF No. 134) is denied.

DATED at Burlington, in the District of Vermont, this 29th day of June 2026.

/s/ William K. Sessions III
Hon. William K. Sessions III
U.S. District Court Judge